UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
Harborview Value Master Fund, L.P.;
Harborview Master Fund, L.P.,

|  |  |
|---|---|
| Plaintiffs, | Docket:  11 Civ. 1323 (CM)(RLE)<br>Purchased:  3/9/11 |
| -against- |  |
| Freeline Sports, Inc.; Renée Tuzee; Ryan<br>Farrelly; Dennis Chateauneuf; Charles<br>W. Redepenning; and Does 1 through 50,<br>inclusive, | **COMPLAINT** |
| Defendants. | **Trial by Jury Demanded** |

--------------------------------------------------------x

Plaintiffs, Harborview Value Master Fund, L.P. ("Harborview") and Harborview Master Fund, L. P. (collectively, "Plaintiffs"), by and through their attorneys, for their Complaint herein, respectfully allege:

## PARTIES

1.      Plaintiffs are British Virgin Island Limited Partnerships whose principal offices are located in Tortola, British Virgin Island.

2.      Plaintiffs are informed and believe and based thereon allege that Defendant, Freeline Sports, Inc. ("Freeline"), is a company organized in Delaware and whose principal offices are located in Irvine, California.

3.      Plaintiffs are informed and believe and based thereon allege that Defendant Ryan Farrelly ("Farrelly"), at all relevant times, was the Co-Founder and President of Freeline, and is a resident of California.

4.      Plaintiffs are informed and believe and based thereon allege that Defendant Renee Tuzee ("Tuzee"), at all relevant times, was the Chief Executive Officer of Freeline, and is a resident of California.

5.      Plaintiffs are informed and believe and based thereon allege that Defendant Dennis Chateauneuf ("Chateauneuf"), at all relevant times, was the Chairman of the Board of Directors and Chief Operations Officer of Freeline, and is a resident of Massachusetts.

6.      Plaintiffs are informed and believe and based thereon allege that Defendant, Charles Redepenning, also known as Chuck Redepenning ("Redepenning"), at all relevant times, was a Director and control person of Freeline, whose duties included head of Freeline's international and footwear divisions, solicitation of investments, global business development, international sales and marketing and footwear.  Plaintiffs are informed and believe and based thereon allege that Defendant, Redepenning, is a resident of Massachusetts.

7.      Plaintiffs are informed and believe and based thereon allege that other persons were representatives, agents, employees, contractors, directors or affiliates of Freeline Sports, Inc., and in such capacity conspired with the named Defendants or otherwise participated in the fraudulent conduct alleged herein, and/or for some other reason are culpable and liable for Plaintiffs' losses alleged herein.  Plaintiffs reserve the right to amend this Complaint to identify such persons and their conduct when such facts become known to Plaintiffs.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that the action is between citizens of a State and citizens of a foreign state and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and under 28 U.S.C. § 1331 in that the action arises under the laws of the United States.

2

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391(a), in that it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property which is the subject of the action is situated and it is the exclusive district in which the parties agreed that the claims hereafter set forth can be brought.

## FIRST CLAIM FOR RELIEF

*(Securities Fraud; Violation of Section 10b against all Defendants)*

(relief sought – injunction and money damages)

10.     Plaintiffs reallege paragraphs 1 through 9.

11.     Plaintiffs are informed and believe and based thereon allege that on or around June 11, 2010, Defendant, Freeline, engaged Endicott Management Partners, LLC ("Endicott") to act as its consultant.  On or around June 11, 2010, Endicott's Ken Londoner introduced Plaintiffs' David Stefansky to Freeline.

12.     Freeline's Farrelly, Tuzee, Chateauneuf and Redepenning met regularly with Londoner and Stefansky in Freeline's Irvine, California offices, and exchanged telephone and email correspondence between May 26, 2010 and August 4, 2010, for the purpose of soliciting Plaintiffs' and Endicott's investment into Freeline.  As part of that investment solicitation process, Londoner and Stefansky were provided numerous documents by such Defendants.

13.     At each and all of several meetings in Freeline's Irvine offices, including on the dates of May 26, May 27, May 28, June 8, June 9, June 10 and June 26, 2010, Farrelly, Tuzee, Chateauneuf and Redepenning made the following verbal and, in some cases written, misrepresentations to Londoner and Stefansky, all with the common purpose and effect of materially overstating Freeline's manufacturing capabilities with respect to its skates, demand for

3

Freeline's products, Freeline's existing inventory and product sales pipelines, including stock on the shelves, and Freeline's ongoing marketing capabilities and efforts, so that Endicott and Plaintiffs would invest substantial funds into Freeline:

       a.       Defendants verbally misrepresented to David Stefansky that Freeline skates were currently being sold by a host of retailers, including Maui & Sons and Sports Chalet, and that Freeline's skates could be found on the shelves of their retail vendors. Farrelly physically brought Londoner to the Maui & Sons Venice Beach store and represented to him that the Freeline Skates on the shelves at that retail outlet were Freeline's skates. Plaintiffs are informed and believe and based thereon allege that, in fact, unbeknownst to Londoner and Plaintiffs, to whom Londoner reported the visit and representation, the skates on the shelf at such retail outlet were knock offs illegally manufactured in violation of Freeline's patent rights, which Freeline had already demanded Maui & Sons to cease and desist selling. In fact, Plaintiffs are informed and believe and based thereon allege that Freeline had been unable to manufacture skates or otherwise provide stock for its retailers for many months prior to that, and had virtually no inventory on the shelves of its retailers.

       b.       Defendants verbally misrepresented to Stefansky that Freeline could quickly manufacture the skates it needed to meet the Fall and Winter demand for its skates, once Plaintiffs had invested into Freeline. In fact, Plaintiffs are informed and believe and based thereon allege that Defendants knew that Freeline and/or its manufacturer in China had terminated their relationship many months earlier due to non-payment by Freeline and other disputes, including the manufacturer's illegal and unauthorized manufacturing and sale of knock offs of Freeline's skates. Plaintiffs are

4

informed and believe and based thereon allege that Defendants knew at that time that a new manufacturer would have to be found, funded, and would have to create the molds from scratch, and complete feasibility and safety testing of the skates, before manufacturing could be started, and that such process could take as much as six months or more.

c.     Consistent with the foregoing misrepresentations, Defendants consistently verbally misrepresented to Stefansky that the distribution pipeline was continuous, repeatedly telling Stefansky at the foregoing meetings that they needed more capital to prevent an interruption in the manufacturing and distribution pipeline and to keep product "on the water."  Plaintiffs are informed and believe and based thereon allege that Defendants knew that such manufacturing and distribution pipeline was terminated long ago as a result in the breakdown of relations between Freeline and its manufacturer and Freeline's inability to pay past bills, as well as for new orders of product.

d.     Defendants misrepresented verbally and in writings provided to Stefansky and Londoner that Freeline had recruited and engaged a skate team of 65 professional and qualified Freeline skaters, managed by Anthony Sheppard, who had scheduled and would attend dozens of marketing events, many run concurrently, at which Freeline skates would be demonstrated to build the demand for the skates.  Plaintiffs are informed and believe and based thereon allege that Defendants knew that Freeline did not have a skate team of one-tenth the size of 65 riders, and that Freeline had never, and never intended to, fund or facilitate even one tenth of the events on the events schedule prepared for and shown to Plaintiffs and other investors.  Plaintiffs are informed and believe and based thereon allege that Anthony Sheppard and a modest group of skaters (less than 6) were

5

funded and directed by Freeline to attend only a small fraction of the events scheduled, despite the fact that such events schedule was being used by Defendants to solicit investments from Plaintiffs and others.

      e.     Plaintiffs are informed and believe and based thereon allege that Defendants provided to Plaintiffs written projections which misrepresented Freeline's actual projections of future revenue from skate sales to Plaintiffs, knowing that Freeline had absolutely no chance of meeting those projections, both because of the undisclosed manufacturing delays they would necessarily incur to establish a new manufacturer and create, from scratch, the molds necessary to such manufacturing pipeline, and because Freeline knew that it had no intention of funding the marketing effort at the level that would be necessary to create such demand, including that Freeline had no intention of funding Anthony Sheppard's proposed schedule of promotional events, or putting together the massive skate team that would be necessary to staff riders for such events.

      f.     Plaintiffs are informed and believe and based thereon allege that Defendants verbally misrepresented to Plaintiffs that Defendants would use the August 4, 2010 funds solicited from them and others in order to pay for 25,000 skates that had purportedly been ordered, manufactured and shipped from its China manufacturer and sold to existing customers.  Plaintiffs are informed and believe and based thereon allege that Freeline's relationship with its manufacturer had been completely severed; the skates had never been ordered, much less manufactured and shipped; Freeline would have to find a new manufacturer, create a mold, conduct product testing, and fund all of the same, before the first Freeline skate could be manufactured and shipped from China, a process that would be costly and take up to six months or more.  Moreover, Plaintiffs are

informed and believe and based thereon allege that the skates had never been ordered, much less sold to Freeline's existing customers, most of whom had lost touch with Freeline during the many months that Freeline had been unable to provide product to such customers.  Plaintiffs are informed and believe and based thereon allege that much of the new stock manufactured six months later had to be airmailed from the manufacturer to meet the year-end Holiday season, too late to meet most demand, and at a cost that exceeded the profit margins on the skates sold.  Plaintiffs are informed and believe and based thereon allege that much of that product that was air mailed in at great expense still sits on the shelves of Freeline's retail clients.  Plaintiffs are informed and believe and based thereon allege that very little of the funds raised from Plaintiffs on August 4, 2010 were in fact used to pay for such skates.

g.      Defendants misrepresented to Stefansky their intentions to maintain the salaries of key executives, Tuzee, Farrelly, and Chateauneuf, at present levels.  Plaintiffs are informed and believe and based thereon allege that Defendants, with Redepenning, intended at that time, and did, in or around January 2011, cause Freeline's Board of Directors to approve employment agreements which included massive increases in salary and promises of two years' severance pay, at such inflated salary levels, essentially taking, for themselves personally, all of Plaintiffs' investment and wiping out much of the perceived value of Freeline.

h.      Defendants verbally misrepresented to Stefansky at those meetings the international demand for Freeline skates, in representing to Stefansky that the international demand was massive and showing, as proof of the same, demonstrations of skaters using Freeline skates in China, Japan, Europe and Latin America.  Plaintiffs are

informed and believe that, in truth, the international demand for Freeline skates was nominal.

        i.     Defendants verbally and in certain writings misrepresented to Plaintiffs and grossly exaggerated Charles Redepenning's involvement with the operations of Freeline, representing him as a full time executive of Freeline who would be leading the international sales and marketing of Freeline skates.  Redepenning boasted an impressive resume in retail, including as President, Chief Operating Officer and General Counsel of Stride Rite, and as manager of major footwear brands including Keds, Sperry Top-Sider, Saucony and Tommy Hilfiger.  Because Redepenning was the only member of management with impressive experience in the retail industry, who leant significant credibility to Freeline's management team for Plaintiffs and other investors, the overstatement of his involvement in Freeline was a material misstatement to investors, including Plaintiffs.  Plaintiffs are informed and believe that Redepenning's actual involvement in the operations of Freeline was part time and, from time to time, nominal or superficial.

14.     On or around the end of July, 2010, David Stefansky and Ken Londoner, along with retail industry experts brought in by Plaintiffs and Endicott to evaluate Freeline, Bo Boyd, Bill Uglow, Bob McNaulty, and a prospective investment manager, Josh Schwartz, met with Farrelly, Tuzee, Chateauneuf and Redepenning at Freeline's offices.  Defendants verbally repeated some or all of the misrepresentations alleged above to the persons at that meeting.

15.     Plaintiffs are informed and believe and based thereon allege that Defendants, and each of them, on or before May 26, 2010, entered into a scheme to defraud Plaintiffs, in violation of Section 10(b) of the Securities and Exchange Act of 1934 and the Rules of the Securities and

Exchange Commission promulgated thereunder, by: (i) withholding material information in connection with the foregoing factual misrepresentations which would have made Plaintiffs aware that such statements were false; and (ii) intentionally making each of the misrepresentations alleged above.

16.     Plaintiffs on or around August 4, 2011, collectively invested $950,000 into Freeline, pursuant to the terms of two Bridge Loan Agreements dated the same date, in reliance on the misrepresentations set forth above, and without knowledge that such statements were false.  Had Plaintiffs known the truth about the foregoing misrepresentations, they would not have invested such funds into Freeline.

17.     Defendants failed to disclose the falsity of the foregoing misrepresentations, and indeed restated many of them, to Plaintiffs during the period August 4, 2010 and November 17, 2010, including statements made to potential investors introduced to Defendants by Endicott at a meeting on November 17, 2010.  Plaintiffs are informed and believe that had Defendants provided corrected or truthful information to Endicott and the prospective investors introduced to Freeline by Endicott, Endicott would have advised Harborview of the same and Harborview would not have made any further investments into Freeline and would, instead, have sought to rescind its prior investment.  Instead, Harborview, on or around November 17, 2010, invested an additional $200,000 into Freeline, pursuant to the terms of a promissory note dated the same date, in reliance on the misrepresentations set forth above, and without knowledge that such statements were false.

18.     Defendants failed to disclose the falsity of the foregoing misrepresentations, and indeed restated many of them, to Harborview during the period August 4, 2010 and January 14, 2011, including statements made to potential investors introduced to Defendants by Endicott at a

9

meeting on November 17, 2010.  Plaintiffs are informed and believe that had Defendants provided corrected or truthful information to Endicott and the prospective investors introduced to Freeline by Endicott, Endicott would have advised Harborview of the same and Harborview would not have made any further investments into Freeline and would, instead, have sought to rescind its prior investment. Harborview, on or around January 14, 2011, invested an additional $119,500 into Freeline, pursuant to the terms of a promissory note dated the same date, in reliance on the misrepresentations set forth above, and without knowledge that such statements were false.

19.     Plaintiffs allege that such wrongful acts by Defendants, and each of them, have directly resulted in Plaintiffs making the investments alleged herein, which investments have resulted in losses to Plaintiffs, in whole or in substantial part of their investments.

20.     Plaintiffs are informed and believe and based thereon allege that in making the false statements and omissions alleged above, Defendants, and each of them, acted with the wrongful and malicious intent to deceive Plaintiffs for the purpose of soliciting investments from them in reliance on such false representations and material omissions.

21.     Plaintiffs reasonably and actually relied upon Defendants' false statements and duty to disclose material information affecting Plaintiffs, to their direct and substantial detriment.

22.     As a result of Defendants' false statements and material omissions, Plaintiffs have suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

*(Common Law Fraud against all Defendants)*

(relief sought – injunction and money damages)

23.     Plaintiffs reallege paragraphs 1 through 22.

10

24.     Freeline's Farrelly, Tuzee, Chateauneuf and Redepenning met regularly with Londoner and Stefansky in Freeline's Irvine, California offices, and exchanged telephone and email correspondence between May 26, 2010 and August 4, 2010, for the purpose of soliciting Plaintiffs' and Endicott's investment into Freeline.  As part of that investment solicitation process, Londoner and Stefansky were provided numerous documents by such Defendants.

25.     At each and all of several meetings in Freeline's Irvine offices, including on the dates of May 26, May 27, May 28, June 8, June 9, June 10 and June 26, 2010, Farrelly, Tuzee, Chateauneuf and Redepenning made the following verbal and, in some cases written, misrepresentations to Londoner and Stefansky, all with the common purpose and effect of materially overstating Freeline's manufacturing capabilities with respect to its skates, demand for Freeline's products, Freeline's existing inventory and product sales pipelines, including stock on the shelves, and Freeline's ongoing marketing capabilities and efforts, so that Endicott and Plaintiffs would invest substantial funds into Freeline:

        a.      Defendants verbally misrepresented to David Stefansky that Freeline skates were currently being sold by a host of retailers, including Maui & Sons and Sports Chalet, and that Freeline's skates could be found on the shelves of their retail vendors. Ryan Farrelly physically brought Londoner to the Maui & Sons Venice Beach store and represented to him that the Freeline Skates on the shelves at that retail outlet were Freeline's skates.  Plaintiffs are informed and believe and based thereon allege that, in fact, unbeknownst to Londoner and Plaintiffs, to whom Londoner reported the visit and representation, the skates on the shelf at such retail outlet were knock offs illegally manufactured in violation of Freeline's patent rights, which Freeline had already demanded Maui & Sons to cease and desist selling.  In fact, Plaintiffs are informed and

11

believe and based thereon allege that Freeline had been unable to manufacture skates or otherwise provide stock for its retailers for many months prior to that, and had virtually no inventory on the shelves of its retailers.

b.      Defendants verbally misrepresented to Stefansky that Freeline could quickly manufacture the skates it needed to meet the Fall and Winter demand for its skates, once Plaintiffs had invested into Freeline.  In fact, Plaintiffs are informed and believe and based thereon allege that Defendants knew that Freeline and/or its manufacturer in China had terminated their relationship many months earlier due to non-payment by Freeline and other disputes, including the manufacturer's illegal and unauthorized manufacturing and sale of knock offs of Freeline's skates.  Plaintiffs are informed and believe and based thereon allege that Defendants knew at that time that a new manufacturer would have to be found, funded, and would have to create the molds from scratch, and complete feasibility and safety testing of the skates, before manufacturing could be started, and that such process could take as much as six months or more.

c.      Consistent with the foregoing misrepresentations, Defendants consistently verbally misrepresented to Stefansky that the distribution pipeline was continuous, repeatedly telling Stefansky at the foregoing meetings that they needed more capital to prevent an interruption in the manufacturing and distribution pipeline and to keep product "on the water."  Plaintiffs are informed and believe and based thereon allege that Defendants knew that such manufacturing and distribution pipeline was terminated long ago as a result in the breakdown of relations between Freeline and its manufacturer and Freeline's inability to pay past bills, as well as for new orders of product.

d.      Defendants misrepresented verbally and in writings provided to Stefansky and Londoner that Freeline had recruited and engaged a skate team of 65 professional and qualified Freeline skaters, managed by Anthony Sheppard, who had scheduled and would attend dozens of marketing events, many run concurrently, at which Freeline skates would be demonstrated to build the demand for the skates.  Plaintiffs are informed and believe and based thereon allege that Defendants knew that Freeline did not have a skate team of one-tenth the size of 65 riders, and that Freeline had never, and never intended to, fund or facilitate even one tenth of the events on the events schedule prepared for and shown to Plaintiffs and other investors.  Plaintiffs are informed and believe and based thereon allege that Anthony Sheppard and a modest group of skaters (less than 6) were funded and directed by Freeline to attend only a small fraction of the events scheduled, despite the fact that such events schedule was being used by Defendants to solicit investments from Plaintiffs and others.

e.      Plaintiffs are informed and believe and based thereon allege that Defendants provided to Plaintiffs written projections which misrepresented Freeline's actual projections of future revenue from skate sales to Plaintiffs, knowing that Freeline had absolutely no chance of meeting those projections, both because of the undisclosed manufacturing delays they would necessarily incur to establish a new manufacturer and create, from scratch, the molds necessary to such manufacturing pipeline, and because Freeline knew that it had no intention of funding the marketing effort at the level that would be necessary to create such demand, including that Freeline had no intention of funding Anthony Sheppard's proposed schedule of promotional events, or putting together the massive skate team that would be necessary to staff riders for such events.

13

f.      Plaintiffs are informed and believe and based thereon allege that Defendants verbally misrepresented to Plaintiffs that Defendants would use the August 4, 2010 funds solicited from them and others in order to pay for 25,000 skates that had purportedly been ordered, manufactured and shipped from its China manufacturer and sold to existing customers.  Plaintiffs are informed and believe and based thereon allege that Freeline's relationship with its manufacturer had been completely severed; the skates had never been ordered, much less manufactured and shipped; Freeline would have to find a new manufacturer, create a mold, conduct product testing, and fund all of the same, before the first Freeline skate could be manufactured and shipped from China, a process that would be costly and take up to six months or more.  Moreover, Plaintiffs are informed and believe and based thereon allege that the skates had never been ordered, much less sold to Freeline's existing customers, most of whom had lost touch with Freeline during the many months that Freeline had been unable to provide product to such customers.  Plaintiffs are informed and believe and based thereon allege that much of the new stock manufactured six months later had to be airmailed from the manufacturer to meet the year-end Holiday season, too late to meet most demand, and at a cost that exceeded the profit margins on the skates sold.  Plaintiffs are informed and believe and based thereon allege that much of that product that was air mailed in at great expense still sits on the shelves of Freeline's retail clients.  Plaintiffs are informed and believe and based thereon allege that very little of the funds raised from Plaintiffs on August 4, 2010 were in fact used to pay for such skates.

g.      Defendants misrepresented to Stefansky their intentions to maintain the salaries of key executives, Tuzee, Farrelly, and Chateauneuf, at present levels.  Plaintiffs

14

are informed and believe and based thereon allege that Defendants, with Redepenning, intended at that time, and did, in or around January 2011, cause Freeline's Board of Directors to approve employment agreements which included massive increases in salary and promises of two years' severance pay, at such inflated salary levels, essentially taking, for themselves personally, all of Plaintiffs' investment and wiping out much of the perceived value of Freeline.

       h.      Defendants verbally misrepresented to Stefansky at those meetings the international demand for Freeline skates, in representing to Stefansky that the international demand was massive and showing, as proof of the same, demonstrations of skaters using Freeline skates in China, Japan, Europe and Latin America.  Plaintiffs are informed and believe that, in truth, the international demand for Freeline skates was nominal.

       i.      Defendants verbally and in certain writings misrepresented to Plaintiffs and grossly exaggerated Charles Redepenning's involvement with the operations of Freeline, representing him as a full time executive of Freeline who would be leading the international sales and marketing of Freeline skates.  Redepenning boasted an impressive resume in retail, including as President, Chief Operating Officer and General Counsel of Stride Rite, and as manager of major footwear brands including Keds, Sperry Top-Sider, Saucony and Tommy Hilfiger.  Because Redepenning was the only member of management with impressive experience in the retail industry, who leant significant credibility to Freeline's management team for Plaintiffs and other investors, the overstatement of his involvement in Freeline was a material misstatement to investors, including Plaintiffs.  Plaintiffs are informed and believe that Redepenning's actual

involvement in the operations of Freeline was part time and, from time to time, nominal or superficial.

26.     On or around the end of July, 2010, David Stefansky and Ken Londoner, along with retail industry experts brought in by Plaintiffs and Endicott to evaluate Freeline, Bo Boyd, Bill Uglow, Bob McNaulty, and a prospective investment manager, Josh Schwartz, met with Farrelly, Tuzee, Chateauneuf and Redepenning at Freeline's offices.  Defendants verbally repeated some or all of the misrepresentations alleged above to the persons at that meeting.

27.     Plaintiffs are informed and believe and based thereon allege that Defendants, and each of them, on or before June 11, 2010, entered into a scheme to defraud Plaintiffs, by: (i) withholding material information in connection with the foregoing factual misrepresentation which would have made Plaintiffs aware that such statements were false; and (ii) intentionally making each of the misrepresentations alleged above.

28.      Plaintiffs on or around August 4, 2011, collectively invested $950,000 into Freeline, pursuant to the terms of two Bridge Loan Agreements dated the same date, in reliance on the misrepresentations set forth above, and without knowledge that such statements were false.  Had Plaintiffs known the truth about the foregoing misrepresentations, they would not have invested such funds into Freeline.

29.     Defendants failed to disclose the falsity of the foregoing misrepresentations, and indeed restated many of them, to Plaintiffs during the period August 4, 2010 and November 17, 2010, including statements made to potential investors introduced to Defendants by Endicott at a meeting on November 17, 2010.  Plaintiffs are informed and believe that had Defendants provided corrected or truthful information to Endicott and the prospective investors introduced to Freeline by Endicott, Endicott would have advised Harborview of the same and Harborview

would not have made any further investments into Freeline and would, instead, have sought to

rescind its prior investment.  Instead, Harborview, on or around November 17, 2010, invested an

additional $200,000 into Freeline, pursuant to the terms of a promissory note dated the same

date, in reliance on the misrepresentations set forth above, and without knowledge that such

statements were false.

30.    Defendants failed to disclose the falsity of the foregoing misrepresentations, and

indeed restated many of them, to Harborview during the period August 4, 2010 and January 14,

2011, including statements made to potential investors introduced to Defendants by Endicott at a

meeting on November 17, 2010.  Plaintiffs are informed and believe that had Defendants

provided corrected or truthful information to Endicott and the prospective investors introduced to

Freeline by Endicott, Endicott would have advised Harborview of the same and Harborview

would not have made any further investments into Freeline and would, instead, have sought to

rescind its prior investment. Harborview, on or around January 14, 2011, invested an additional

$119,500 into Freeline, pursuant to the terms of a promissory note dated the same date, in

reliance on the misrepresentations set forth above, and without knowledge that such statements

were false.

31.    Plaintiffs are informed and believe and based thereon allege that such wrongful

acts by Defendants, and each of them, have directly resulted in Plaintiffs making the investments

alleged herein, which investments have resulted in losses to Plaintiffs, in whole or in substantial

part.

32.    In making the false statements and omissions alleged above, Defendants, and each

of them, acted with the wrongful and malicious intent to deceive Plaintiffs for the purpose of

soliciting investments from them in reliance on such false representations and material omissions.

33.     Plaintiffs reasonably and actually relied upon Defendants' false statements and duty to disclose material information affecting Plaintiffs, to their direct and substantial detriment.

34.     As a result of Defendants' false statements and material omissions, Plaintiffs have suffered damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

*(Negligent Misrepresentation against all Defendants)*

(relief sought – injunction and money damages)

35.     Plaintiffs reallege paragraphs 1 through 9.

36.     Freeline's Farrelly, Tuzee, Chateauneuf and Redepenning met regularly with Londoner and Stefansky in Freeline's Irvine, California offices, and exchanged telephone and email correspondence between May 26, 2010 and August 4, 2010, for the purpose of soliciting Plaintiffs' and Endicott's investment into Freeline.  As part of that investment solicitation process, Londoner and Stefansky were provided numerous documents by such Defendants.

37.     At each and all of several meetings in Freeline's Irvine offices, including on the dates of May 26, May 27, May 28, June 8, June 9, June 10 and June 26, 2010, Farrelly, Tuzee, Chateauneuf and Redepenning made the following verbal and, in some cases written, misrepresentations to Londoner and Stefansky, all with the common purpose and effect of materially overstating Freeline's manufacturing capabilities with respect to its skates, demand for Freeline's products, Freeline's existing inventory and product sales pipelines, including stock on the shelves, and Freeline's ongoing marketing capabilities and efforts, so that Endicott and Plaintiffs would invest substantial funds into Freeline:

18

a.    Defendants verbally misrepresented to David Stefansky that Freeline skates were currently being sold by a host of retailers, including Maui & Sons and Sports Chalet, and that Freeline's skates could be found on the shelves of their retail vendors. Ryan Farrelly physically brought Londoner to the Maui & Sons Venice Beach store and represented to him that the Freeline Skates on the shelves at that retail outlet were Freeline's skates.  Plaintiffs are informed and believe and based thereon allege that, in fact, unbeknownst to Londoner and Plaintiffs, to whom Londoner reported the visit and representation, the skates on the shelf at such retail outlet were knock offs illegally manufactured in violation of Freeline's patent rights, which Freeline had already demanded Maui & Sons to cease and desist selling.  In fact, Plaintiffs are informed and believe and based thereon allege that Freeline had been unable to manufacture skates or otherwise provide stock for its retailers for many months prior to that, and had virtually no inventory on the shelves of its retailers.

b.    Defendants verbally misrepresented to Stefansky that Freeline could quickly manufacture the skates it needed to meet the Fall and Winter demand for its skates, once Plaintiffs had invested into Freeline.  In fact, Plaintiffs are informed and believe and based thereon allege that Defendants knew that Freeline and/or its manufacturer in China had terminated their relationship many months earlier due to non-payment by Freeline and other disputes, including the manufacturer's illegal and unauthorized manufacturing and sale of knock offs of Freeline's skates.  Plaintiffs are informed and believe and based thereon allege that Defendants knew at that time that a new manufacturer would have to be found, funded, and would have to create the molds from scratch, and complete feasibility and safety testing of the skates, before

19

manufacturing could be started, and that such process could take as much as six months or more.

      c.      Consistent with the foregoing misrepresentations, Defendants consistently verbally misrepresented to Stefansky that the distribution pipeline was continuous, repeatedly telling Stefansky at the foregoing meetings that they needed more capital to prevent an interruption in the manufacturing and distribution pipeline and to keep product "on the water."  Plaintiffs are informed and believe and based thereon allege that Defendants knew that such manufacturing and distribution pipeline was terminated long ago as a result in the breakdown of relations between Freeline and its manufacturer and Freeline's inability to pay past bills, as well as for new orders of product.

      d.      Defendants misrepresented verbally and in writings provided to Stefansky and Londoner that Freeline had recruited and engaged a skate team of 65 professional and qualified Freeline skaters, managed by Anthony Sheppard, who had scheduled and would attend dozens of marketing events, many run concurrently, at which Freeline skates would be demonstrated to build the demand for the skates.  Plaintiffs are informed and believe and based thereon allege that Defendants knew that Freeline did not have a skate team of one-tenth the size of 65 riders, and that Freeline had never, and never intended to, fund or facilitate even one tenth of the events on the events schedule prepared for and shown to Plaintiffs and other investors.  Plaintiffs are informed and believe and based thereon allege that Anthony Sheppard and a modest group of skaters (less than 6) were funded and directed by Freeline to attend only a small fraction of the events scheduled, despite the fact that such events schedule was being used by Defendants to solicit investments from Plaintiffs and others.

e.      Plaintiffs are informed and believe and based thereon allege that Defendants provided to Plaintiffs written projections which misrepresented Freeline's actual projections of future revenue from skate sales to Plaintiffs, knowing that Freeline had absolutely no chance of meeting those projections, both because of the undisclosed manufacturing delays they would necessarily incur to establish a new manufacturer and create, from scratch, the molds necessary to such manufacturing pipeline, and because Freeline knew that it had no intention of funding the marketing effort at the level that would be necessary to create such demand, including that Freeline had no intention of funding Anthony Sheppard's proposed schedule of promotional events, or putting together the massive skate team that would be necessary to staff riders for such events.

f.      Plaintiffs are informed and believe and based thereon allege that Defendants verbally misrepresented to Plaintiffs that Defendants would use the August 4, 2010 funds solicited from them and others in order to pay for 25,000 skates that had purportedly been ordered, manufactured and shipped from its China manufacturer and sold to existing customers.  Plaintiffs are informed and believe and based thereon allege that Freeline's relationship with its manufacturer had been completely severed; the skates had never been ordered, much less manufactured and shipped; Freeline would have to find a new manufacturer, create a mold, conduct product testing, and fund all of the same, before the first Freeline skate could be manufactured and shipped from China, a process that would be costly and take up to six months or more.  Moreover, Plaintiffs are informed and believe and based thereon allege that the skates had never been ordered, much less sold to Freeline's existing customers, most of whom had lost touch with Freeline during the many months that Freeline had been unable to provide product to

21

such customers.  Plaintiffs are informed and believe and based thereon allege that much of the new stock manufactured six months later had to be airmailed from the manufacturer to meet the year-end Holiday season, too late to meet most demand, and at a cost that exceeded the profit margins on the skates sold.  Plaintiffs are informed and believe and based thereon allege that much of that product that was air mailed in at great expense still sits on the shelves of Freeline's retail clients.  Plaintiffs are informed and believe and based thereon allege that very little of the funds raised from Plaintiffs on August 4, 2010 were in fact used to pay for such skates.

g.      Defendants misrepresented to Stefansky their intentions to maintain the salaries of key executives, Tuzee, Farrelly, and Chateauneuf, at present levels.  Plaintiffs are informed and believe and based thereon allege that Defendants, with Redepenning, intended at that time, and did, in or around January 2011, cause Freeline's Board of Directors to approve employment agreements which included massive increases in salary and promises of two years' severance pay, at such inflated salary levels, essentially taking, for themselves personally, all of Plaintiffs' investment and wiping out much of the perceived value of Freeline.

h.      Defendants verbally misrepresented to Stefansky at those meetings the international demand for Freeline skates, in representing to Stefansky that the international demand was massive and showing, as proof of the same, demonstrations of skaters using Freeline skates in China, Japan, Europe and Latin America.  Plaintiffs are informed and believe that, in truth, the international demand for Freeline skates was nominal.

22

i.      Defendants verbally and in certain writings misrepresented to Plaintiffs and grossly exaggerated Charles Redepenning's involvement with the operations of Freeline, representing him as a full time executive of Freeline who would be leading the international sales and marketing of Freeline skates.  Redepenning boasted an impressive resume in retail, including as President, Chief Operating Officer and General Counsel of Stride Rite, and as manager of major footwear brands including Keds, Sperry Top-Sider, Saucony and Tommy Hilfiger.  Because Redepenning was the only member of management with impressive experience in the retail industry, who leant significant credibility to Freeline's management team for Plaintiffs and other investors, the overstatement of his involvement in Freeline was a material misstatement to investors, including Plaintiffs.  Plaintiffs are informed and believe that Redepenning's actual involvement in the operations of Freeline was part time and, from time to time, nominal or superficial.

38.     Plaintiffs are informed and believe and based thereon allege that Defendants, and each of them, on or before June 11, 2010, made the foregoing misrepresentations either with knowledge of the falsity of such statements, or without any reasonable ground for believing such statements to be true.

39.     Plaintiffs on or around August 4, 2011, collectively invested $950,000 into Freeline, pursuant to the terms of two Bridge Loan Agreements dated the same date, in reliance on the misrepresentations set forth above, and without knowledge that such statements were false.  Had Plaintiffs known the truth about the foregoing misrepresentations, they would not have invested such funds into Freeline.

40.     Defendants failed to disclose the falsity of the foregoing misrepresentations, and indeed restated many of them, to Plaintiffs during the period August 4, 2010 and November 17, 2010, including statements made to potential investors introduced to Defendants by Endicott at a meeting on November 17, 2010.  Plaintiffs are informed and believe that had Defendants provided corrected or truthful information to Endicott and the prospective investors introduced to Freeline by Endicott, Endicott would have advised Harborview of the same and Harborview would not have made any further investments into Freeline and would, instead, have sought to rescind its prior investment.  Instead, Harborview, on or around November 17, 2010, invested an additional $200,000 into Freeline, pursuant to the terms of a promissory note dated the same date, in reliance on the misrepresentations set forth above, and without knowledge that such statements were false.

41.     Defendants failed to disclose the falsity of the foregoing misrepresentations, and indeed restated many of them, to Harborview during the period August 4, 2010 and January 14, 2011, including statements made to potential investors introduced to Defendants by Endicott at a meeting on November 17, 2010.  Plaintiffs are informed and believe that had Defendants provided corrected or truthful information to Endicott and the prospective investors introduced to Freeline by Endicott, Endicott would have advised Harborview of the same and Harborview would not have made any further investments into Freeline and would, instead, have sought to rescind its prior investment. Harborview, on or around January 14, 2011, invested an additional $119,500 into Freeline, pursuant to the terms of a promissory note dated the same date, in reliance on the misrepresentations set forth above, and without knowledge that such statements were false.

42.     Plaintiffs are informed and believe and based thereon allege that such wrongful acts by Defendants, and each of them, have directly resulted in Plaintiffs making the investments alleged herein, which investments have resulted in losses to Plaintiffs, in whole or in substantial part.

43.     In making the false statements and omissions alleged above, Defendants, and each of them, acted with the wrongful and malicious intent to deceive Plaintiffs for the purpose of soliciting investments from them in reliance on such false representations and material omissions.

44.     Plaintiffs reasonably and actually relied upon Defendants' false statements and duty to disclose material information affecting Plaintiffs, to their direct and substantial detriment.

45.     As a result of Defendants' false statements and material omissions, Plaintiffs have suffered damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

*(Violation of Section 20(a) against all Defendants)*

(relief sought – money damages)

46.     Plaintiffs reallege paragraphs 1 through 45.

47.     Plaintiffs are informed and believe and based thereon allege that Defendants, Farrelly, Tuzee, Chateauneuf and Redepenning, at all relevant times, were control persons of Freeline Sports, Inc. within the meaning of §20(a) of the Securities and Exchange Act.  Farrelly, Tuzee and Chateauneuf were represented as and acted as the President, Chief Executive Officer and Chief Operating Officer of Freeline, respectively, at all relevant times.  In addition, Plaintiffs are informed and believe and based thereon allege that Tuzee, Chateauneuf and Redepenning constituted, at all relevant times, 3 of the 5 (together, a controlling block) of the members of the

25

Board of Directors of Freeline.  Plaintiffs are informed and believe and based thereon allege that Redepenning also was actively involved at the executive level in the operations of the company. Plaintiffs are informed and believe and based thereon allege that although he was not a designated officer of the Company, Redepenning assisted in the solicitation of investment by meeting with Stefansky, Londoner and others, and touting his experience as former General Counsel and Secretary of Stride Rite since March 1998, President of Stride Rite International Corp. since December 1999 and Chief Operating Officer of Stride Rite until his departure in 2008.  Redepenning boasted to Plaintiffs that he had extensive global footwear / soft goods experience, and would be responsible for Freeline's international sales and marketing and footwear.  Plaintiffs are informed and believe and based thereon allege that the Defendants, and each of them, also own a substantial and, together, controlling block of the outstanding stock of Freeline and, as a result, control its Board of Directors, and profited indirectly from Plaintiffs' investments.

48.     Plaintiffs are informed and believe and based thereon allege that each such Defendant, by reason of his or her position with Freeline and/or his or her stock ownership in the company, had the power and authority to cause Freeline to engage in the wrongful conduct complained of herein.

49.     Plaintiffs are informed and believe and based thereon allege that each of such Defendants culpably participated in making and affirming the false representations, and in failing to disclose the true information to Plaintiffs, as alleged above, prior to Plaintiffs' making their investments in Freeline.

50.     As a result, each such Defendant is liable to Plaintiffs for damages to be determined at trial.

## FIFTH CLAIM FOR RELIEF

*(Breach of Fiduciary Duties against all Defendants)*

(relief sought – injunction and money damages)

51.     Plaintiffs reallege paragraphs 1 through 50.

52.     Plaintiffs are informed and believe and based thereon allege that Defendants, Farrelly, Tuzee, Chateauneuf and Redepenning, at all relevant times, were control persons of Freeline Sports, Inc. within the meaning of §20(a) of the Securities and Exchange Act.  Farrelly, Tuzee and Chateauneuf were represented as and acted as the President, Chief Executive Officer and Chief Operating Officer of Freeline, respectively, at all relevant times.  In addition, Plaintiffs are informed and believe and based thereon allege that Tuzee, Chateauneuf and Redepenning constituted, at all relevant times, 3 of the 5 (a controlling block) of the members of the Board of Directors of Freeline.  Plaintiffs are informed and believe and based thereon allege that Redepenning also was actively involved at the executive level in the operations of the company. Plaintiffs are informed and believe and based thereon allege that although he was not a designated officer of the Company, Redepenning assisted in the solicitation of investment by meeting with Stefansky, Londoner and others, and touting his experience as former General Counsel and Secretary of Stride Rite since March 1998, President of Stride Rite International Corp. since December 1999 and Chief Operating Officer of Stride Rite until his departure in 2008.  Redepenning boasted to Plaintiffs that he had extensive global footwear / soft goods experience, and would be responsible for Freeline's international sales and marketing and footwear.  Plaintiffs are informed and believe and based thereon allege that the Defendants, and each of them, also own a substantial and, together, controlling block of the outstanding stock of

Freeline and, as a result, control its Board of Directors, and profited indirectly from Plaintiffs'
investments.

53.     Plaintiffs are informed and believe and based thereon allege that at all relevant
times after Plaintiffs' investment on August 4, 2010, Freeline was insolvent, in that its liabilities
exceeded its assets.  Accordingly, at all relevant times after August 4, 2010, each of the
Defendants owed fiduciary duties to the creditors of Freeline, including Plaintiffs, to manage the
assets of Freeline in a prudent, professional, competent and loyal manner, for the benefit of such
creditors.

54.     Plaintiffs are informed and believe and based thereon allege that each such
Defendant, by reason of his or her position with Freeline and/or his or her stock ownership in the
company, had the power and authority to cause Freeline to engage in the wrongful conduct
complained of herein.

55.     Plaintiffs are informed and believe and based thereon allege that each of such
Defendants breached such fiduciary duties by culpably participating in making and affirming the
false representations, and in failing to disclose the true information to Plaintiffs, as alleged
above, prior to Plaintiffs' making their investments in Freeline.  Plaintiffs are informed and
believe and based thereon allege that each of such Defendants participated in approving, on
behalf of Freeline, the massive salary and severance increases given to Farrelly, Tuzee and
Chateauneuf in January 2011, shortly before Plaintiffs learned the truth about the alleged
misrepresentations.  Plaintiffs are informed and believe and based thereon allege that each of
such Defendants also participated in corporate waste of Freeline's assets in order to cover up
their prior misrepresentations to Plaintiffs, including spending tens of thousands of dollars (more
than the projected profit on the sales of such merchandise) air shipping skates from China to the

United States to superficially stock retailers' shelves at the end of the Holiday season in 2010. The foregoing acts of neglect and self-dealing violated Defendants' fiduciary duties owed to Plaintiffs.

56.     As a direct and proximate result of such breaches by Defendants of their fiduciary duties owed to Plaintiffs, Plaintiffs suffered damages, including the loss of their investment in Freeline.

57.  As a result of the foregoing, Plaintiffs are entitled to an award of damages against Defendants, and each of them, in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

*(Breach of Contract Against Freeline)*

(relief sought – money damages)

58.     Plaintiffs reallege paragraphs 1 through 22, and 46 through 50, inclusive.

59.     On or around August 4, 2011, Plaintiffs invested $950,000 into Freeline, pursuant to the terms of two Bridge Loan Agreements dated the same date, in reliance on the misrepresentations set forth above (including those detailed in all subparts of paragraph 25), and without knowledge that such statements were false.  Had Plaintiffs known the truth about the foregoing misrepresentations, they would not have invested such funds into Freeline. Harborview, on or around November 17, 2010, invested an additional $200,000 into Freeline, pursuant to the terms of a Promissory Note dated the same date, in reliance on the misrepresentations set forth above, and without knowledge that such statements were false. Harborview, on or around January 14, 2011, invested an additional $119,500 into Freeline, pursuant to the terms of a Promissory Note dated the same date, in reliance on the misrepresentations set forth above, and without knowledge that such statements were false.

29

60.     Section 17(b) of each of the Promissory Notes defines an Event of Default of such notes as including a circumstance in which a statement contained in the Bridge Loan Agreement "shall be false or misleading in any material respect at the time made…."  Paragraph 4(f) of the Bridge Loan Agreement provides a representation by Freeline that "[t]he execution and delivery of this Agreement and each of the other Transaction Agreements by the Company, the issuance of the Securities in accordance with the terms hereof, and the consummation by the Company of the other transactions contemplated by this Agreement, the Notes, the Warrants and the other Transaction Agreements do not and will not: (i) conflict with or result in a breach by the Company of any of the terms or provisions of, or constitute a default under … (D) to its knowledge, any existing applicable law, rule, or regulation…."

61.     As alleged above, Freeline knowingly violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and the Rules of the Securities and Exchange Commission promulgated thereunder at and before the time that it entered into the Bridge Loan Agreement on August 4, 2010.  Accordingly, Plaintiffs are informed and believe and based thereon allege that Defendant, Freeline, breached section 17(b) of the Promissory Notes and Section 4(f) of the Bridge Loan Agreement dated August 4, 2010.

62.     As a direct and proximate result of the foregoing breach of contract, Plaintiffs were damaged in the full amount of the principal loaned on account of the Promissory Notes, with interest and attorneys' fees and costs.  Plaintiffs are entitled to and seek herein to recover attorneys' fees and costs in this action pursuant to section 15 of the Promissory Notes and section 9(a) of the Bridge Loan Agreement.

63.     Plaintiffs are entitled to and hereby do make demand for the repayment of the outstanding principal, interest and attorneys' fees due under the Promissory Notes and Bridge Loan Agreements.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, and each of them, as follows:

i)      on the **FIRST CLAIM FOR RELIEF** for an injunction preliminarily and permanently directing Freeline Sports, Inc. and all those in active concert with it, to stop spending money held in its accounts, and to freeze such invested funds pending resolution of this lawsuit; for compensatory and punitive damages according to proof at trial; and

ii)     on the **SECOND CLAIM FOR RELIEF** for rescission of all of Freeline Sports, Inc.'s contracts with Plaintiffs, for an injunction preliminarily and permanently directing Freeline Sports, Inc. and all those in active concert with it, to stop spending money fraudulently acquired from Plaintiffs, and to freeze such invested funds pending resolution of this lawsuit; for compensatory and punitive damages according to proof at trial; and

iii)    on the **THIRD CLAIM FOR RELIEF** for an injunction preliminarily and permanently directing Freeline Sports, Inc. and all those in active concert with it, to stop spending money held in its accounts, and to freeze such invested funds pending resolution of this lawsuit, and for compensatory damages according to proof at trial; and

iv)     on the **FOURTH CLAIM FOR RELIEF** for damages against each and all Defendants in an amount to be determined at trial; and

v)    on the **FIFTH CLAIM FOR RELIEF** for an injunction preliminarily and

permanently directing Freeline Sports, Inc. and all those in active concert with

it, to stop spending money held in its accounts, and to freeze such invested

funds pending resolution of this lawsuit, and for compensatory damages

according to proof at trial; and

vi)    on the **SIXTH CLAIM FOR RELIEF** for principal, interest and attorneys' fees

due on the Promissory Notes and Bridge Loan Agreement against Freeline,

only, in an amount to be determined at trial; and

vii)    on all Claims for Relief for reasonable attorneys' fees, interest, the costs and

disbursements of this action and for such other, further and different relief as

the Court deems just and proper.

Dated: New York, New York
March 7, 2011

CORRIGAN & MORRIS, LLP

By: _____ /s/ *B. Corrigan*

Stanley C. Morris (SM-5814)
Brian T. Corrigan (BC-2636)
Corrigan & Morris LLP
201 Santa Monica Blvd., Suite 475
Santa Monica, CA 90401
(310) 394-2828 Tel.
(310) 394-2825 Fax

-- and --

LOPRESTI & ASSOCIATES, PLLC

By: __ /s/ *A. LoPresti*

Anthony A. LoPresti (AL-7706)
30 Broad Street, 37th Floor
New York, N.Y. 10004
(ph) (212) 425-0551 (f) (212) 658-9001

*Local counsel/Attorneys for the Plaintiffs*

32